### Sgro, Appellant, *v.* Stuyvesant Insurance Company.

Argued May 4, 1938.

Before KELLER, P. J., CUNNINGHAM, BALD-RIGE, STADTFELD, PARKER and RHODES, JJ.

*John E. Evans, Jr.,* with him *John E. Evans, Sr.,* of *Margiotti, Pugliese, Evans & Buckley* and *William A. Ashe,* for appellant.

*George Y. Meyer,* with him *Samuel G. Wagner,* for appellee.

OPINION BY KELLER, P. J., September 28, 1938:

This is an action of assumpsit on an unusual contract of insurance,—known as "FINANCE FIRE AND

THEFT CONTRACT—Open Policy—Certificate Plan" —covering loss and damage to an automobile truck by fire and theft. It is to be hoped that, if its use becomes general, it will be so construed as to furnish greater safeguards and protection to the owner of the truck than were accorded the plaintiff in this case. The policy, as interpreted by the defendant, seems to have been applied almost wholly for the benefit of the seller of the truck, or its affiliate finance company, and with small regard for the purchaser, who actually furnished the money to pay the insurance premium.

On February 16, 1933, the defendant insurance company issued to the *"Assured,* Brockway Motor Truck Corporation and/or Brockway Motor Co. Inc. [1]" both of Cortland, N. Y., an "open" automobile fire and theft insurance policy, No. 8350, using a skeleton form common for ordinary automobile insurance. Standing by itself, it was no contract of insurance at all, for it contained no subject of insurance, no amount, no term, and no premium. It was made effective as a contract or policy by a rider and certain certificates referred to in the rider. This rider, entitled "Finance Fire and Theft Contract — Open Policy — Certificate Plan" — covered "automobiles, trucks, tractors and trailers sold or leased under the deferred payment plan by Brockway Motor Truck Corp. and/or Brockway Motor Co. Inc. (hereinafter referred to as the Finance Company)." It provided that the insurance company should "issue certificates running for a period of not longer than twenty-four (24) months *to the persons entering into contracts* for conditional sales, or leasing, or executing chattel mortgages in and about the acquisition or purchase of automobiles, trucks, tractors or trailers, ...... after such transaction shall have been approved by the Finance

---

[1] The record before us fails to show why two corporations were named as the "assured," connected by an "and/or" clause, or what was the relationship between the two assured.

Company, and this policy shall apply to each vehicle leased or sold by any such dealer, distributor, etc., from the time of delivery of the vehicle to the purchaser, following the approval of the purchaser's credit application by the Finance Company, certificates being issued as hereinafter provided."

The rider contained eight paragraphs. Those deemed relevant in this case follow:

"2. It is a condition of this agreement that the assured will declare for insurance under this policy every vehicle financed by them upon which there is any mortgage indebtedness insofar as it shall be in their power to control this insurance and *any declaration on account of insurance commitments which the Finance Company may make in connection with the acceptance of the papers evidencing such indebtedness, shall during or pending such acceptances be construed as a binder under this contract,* and this contract shall be in effect following such acceptance pending the issuance of a certificate of evidence of the transaction; providing, however, that the certificates must be issued within a period of thirty (30) days from the inception of the assured's interest in the property insured hereunder, and that when issued the certificates shall be dated concurrently with the inception of the assured's interest.

"3. It is agreed that this policy is issued for the benefit of several parties and all certificates are to insure for joint benefit the insured and for individuals as their interest may appear, and in the event of loss within the confines of this policy, same shall be payable: FIRST: to the Finance Company (As interest, if any, may appear); SECOND: If any, to individuals as designated in the certificates issued hereunder." [Italics supplied.]

The policy was signed by the president and secretary of the defendant, but was not to be valid unless counter-

signed by a duly authorized agent of the company. This validity was furnished by the countersignature of the agent at New York, as follows, the insertions in the blanks being italicized:

Agency at *York-Jersey Underwriters, Inc.*
New York City

*H. Van Iderstine, Jr.*
Agent.

The automobiles insured, the amount of insurance, the premiums to be paid and the dates of expiration were all to be "as per certificates." It may be noted that in the warranties by the Assured, its occupation or business was stated to be *"Truck* Manufacturers".[2] It is also to be noted that the Finance Company, one of the assured, might make *insurance commitments in favor of purchasers of trucks,* etc., financed by it, which should be construed as a 'binder' under the policy contract, thus constituting it, for that purpose, the agent of the insurer.

The policy, before the addition of the rider, contained the usual cancellation clause providing for its cancellation at any time on request of the Assured, and for its cancellation by the insurance company by giving the Assured five days' written notice of cancellation. But in view of the fact that by the attached rider, which actually constituted the "Finance Fire and Theft Contract," the policy called for the issuance by the insurance company of certificates to the purchasers of trucks, etc., in which certificates the purchasers were referred to as the 'assured', the certificate holders became parties assured to the extent that the policy could not be cancelled by either the named Assured or the insurance company, without giving them notice of such intended cancellation, so that they could take steps for their own protection. The use of the term 'Assured', which

---

[2] The assured, in this respect, clearly refers to the manufacturer, and not the Finance Company.

in some parts of the policy referred to the manufacturer, and in others, to the Finance Company, will in this respect be enlarged to include the certificate holder.

On March 13, 1933, under the provisions of the foregoing insurance contract, the defendant insurance company issued in the name of the plaintiff, Lucy Sgro, the following certificate of insurance coverage,[3] being a certificate provided for under the second, third, fifth and seventh paragraphs of the rider effecting this insurance:

THE STUYVESANT INSURANCE COMPANY 1025
111 William Street
New York, N. Y.
Memorandum of Insurance Coverage
To                         Date *March 13th, 1933* 193—
Name      *Lucy Sgro*
Address      *Numine, Penna.*

You are hereby advised that, as requested by you, and as required in the agreement contained in the lien instrument executed by you, the automobile described in this memorandum is insured under Open Policy No. 8350 issued by

THE STUYVESANT INSURANCE COMPANY
To BROCKWAY MOTOR COMPANY, Inc.

for the benefit of the several parties in interest in the said automobile and the notes made in connection with the purchase thereof, with loss, if any, payable first to the holders and endorsers of any unpaid notes to the extent of their interest, and the remainder, if any, payable to you as the maker of the notes. All terms and conditions of this insurance are stated fully in the policy, which is in the possession of Brockway Motor Company, Inc.

WARRANTIES BY THE PURCHASER AND/OR
LESSEE FOLLOW

---

[3] The words italicized were inserted in typewriting in the printed blank form.

The following is a description of the automobile:

| Year and Model | Trade Name | Type of Body (Give Truck Tonnage) | Serial Number and Motor Number |
|---|---|---|---|
| 1933 | Brockway | 1½ Ton | S 80-C5-5700 M 26-B-2251 |

| Actual Cost To Assured Including Equip. | Encumbrance | Purchased by Assured Month Year New or 2d Hand |
|---|---|---|
| $1719.58 | $ Unpaid Balance Notes of $ Each (No.) | Feb. 1933 new |

OCCUPATION *general contracting*

The uses to which the automobile described is and will be put, are *commercial*

The automobile described is usually kept in *private* garage located *Numine, Pa.*

Perils Insured Against—Fire and Theft *and $100 deductible collision.* Amount of Insurance *Thirteen hundred and 00/100* DOLLARS *($1300.00)*

This Memorandum covers from *February 20th* 1933 to *February 20th* 1934

In the event of loss, notify

YORK-JERSEY UNDERWRITERS, Inc.

Perth Amboy National Bank Bldg.,

Perth Amboy, N. J.

THE STUYVESANT INSURANCE COMPANY

The certificate should have been sent by the insurance company to Mrs. Sgro, at the address given in the certificate, for the policy contract so provided and designated her the 'certificate *holder.*' It failed or neglected to do so, and it is responsible for the consequences flowing from such failure or neglect. Instead, it forwarded the certificate to its agent in this respect, Brockway

Motor Co. Inc., at Pittsburgh, and the latter failed or neglected to deliver it to Mrs. Sgro, but kept it until after the fire, when it was forwarded to its main office at Cortland, N. Y. As the certificate, on its face, protected the superior claim of the Brockway Motor Co. Inc., there was no reason why the latter should retain both the policy and the certificate. By reason of this failure or neglect of the insurance company and its agent in this respect, Mrs. Sgro never received any paper purporting to grant or secure her any insurance coverage on her truck insured by defendant company and she was not informed of, nor did she know, the name of the insurance carrier until over a year after the loss of her truck by fire and theft, notwithstanding repeated efforts in the meantime by her attorneys on her behalf to obtain the information.

The plaintiff's interest in the insured truck came about in the following manner, and in relating the facts we shall confine ourselves to the evidence in the record and such evidence as was offered but erroneously excluded, or as was received but afterwards erroneously stricken out.

The plaintiff is an Italian woman who can neither read nor write English. With the aid of her two sons, Dominic and Sam, she carries on a general contracting and trucking business at Numine, Pa., a small town of about 1500 people in Armstrong County. In February 1933, her son Dominic went to the Pittsburgh office of Brockway Motor Co. Inc. and made all arrangements, on her behalf, with the manager in charge of said office for the purchase on the installment plan of a new Brockway truck, Year 1933, Model 80, Dump body, 1½ ton capacity, for the price of $1780.58 (which included $61 premium for insurance), payable as follows: $150 cash, the delivery of two used Indiana trucks, for which an allowance of $770.92 was made by the seller, and twelve notes, (eleven for $72 each and the last for

$67.66, payable successively on the 25th of the month, beginning March 25, 1933), aggregating $859.66. On February 25, 1933, the other son, Sam, accompanied by an employee of his mother, James R. Dickey, completed the transaction for Mrs. Sgro, and signed a bailment lease in her name, dated February 23, 1933, for a Brockway Truck, Model 80-C5-5700, Engine No. 26-B-2251—the truck insured in the certificate in this case— delivered the used Indiana trucks, Nos. 115 AE 038 and 115 AE 028, paid $100 cash in addition to a prior deposit of $50 made by Dominic and delivered the twelve notes called for by the bailment lease, and took away the Brockway truck. The Brockway Motor Co., at the same time, gave two papers which were offered in evidence and should have been received—Exhibits 3 and 4 —the former giving the full details of how the purchase price of $1719.58 was arrived at and also showing credits of $1780.58; and the latter, a memorandum, dated February 25, 1933, showing a premium charge for insurance on the truck of $61—which was included in the credit of $1780.58. This memorandum identified the truck by the serial number and motor number set forth in the insurance certificate dated March 13, 1933, sixteen days later. A copy of each of these papers was sent to the countersigning agent of the defendant company for the purpose of preparing the certificate of insurance (151a-152a). As the policy rider provided in paragraph 2 that any declaration on account of insurance commitments which the Brockway Motor Co. Inc. might make in connection with the acceptance of the lease and its accompanying notes, should be construed as a *binder* under the policy contract and the policy contract should be in effect as to such truck following the acceptance of the lease and notes, provided a certificate of insurance in favor of the purchaser or lessee was issued within thirty days thereafter, the memorandum of the insurance premium,

charged against this plaintiff and included in the payments made by her, was relevant evidence, it being admitted that on that date (February 25, 1933) the policy contract with defendant insurance company was in force and effect. The policy rider provided (paragraph 6) that in stating the cost of the truck for insertion in the certificate of insurance, no charges for insurance should be included, which explains the difference between the price stated in the bailment lease and that in the certificate of insurance, adverted to unfavorably by appellee.

By January 10, 1934 Mrs. Sgro had paid Brockway Motor Co. all of the purchase money of said truck but $257.69. On the early evening of that date, while the truck was being used by the plaintiff for hauling a load of straw for a farmer, Steve Danenberg, and was in charge of two of plaintiff's employees, James R. Dickey and Jack Wagner, the truck or its contents caught fire and both were destroyed. When the truck caught fire it was about two and a half miles from Numine, and on a dirt road about half a mile off the main highway. The day was cold and snowy. Shortly after, between five and six o'clock that evening, Dominic Sgro was informed by telephone that the truck was on fire and he went at once to the scene. When he got there he found the truck and load of straw all on fire. He said there was nothing that he could then do as it was all in flames. He stayed on the scene until 11:30 o'clock that night, when he left for his home. At that time certain parts of the truck, the tires, etc., were still burning and the damage was complete. The suggestion of counsel for appellee that he should have towed the blazing truck along the highway to his mother's garage does not merit serious consideration. He returned next morning at eight o'clock and found that during the night some person or persons had stripped the wreck of certain metal parts that were not consumed by the

fire. He hauled the remains to his mother's garage, where the truck had been kept, and they remained there in the same condition until after the inspection by the adjuster sent by defendant's agent, as hereinafter stated. However, they were only junk (p. 98a).

That same day (January 11, 1934) at Dominic's direction, Dickey notified the Cashier and Accountant of Brockway Motor Co. by telephone to its Pittsburgh office, that the truck had been burned, giving details; and later that day confirmed the notice by letter; and the same day, January 11, 1934, Brockway Motor Co. wrote the defendant company that the truck insured under certificate #1025 took fire on the highway and had been burned, giving the details furnished by Dickey (p. 106a). This notice was sent to York-Jersey Underwriters, Inc., Perth Amboy, N. J., as specifically required by the certificate, (*Gough v. Halperin*, 306 Pa. 230, 234, 159 A. 447), and was received on January 12, 1934. Notice by Brockway Motor Co., an assured, inured to the benefit of all the insured, including the plaintiff: *McClellan v. Madonti*, 313 Pa. 515, 169 A. 760; *Morris v. Bender*, 317 Pa. 533, 177 A. 776. Furthermore, the defendant is not in a position to object to the plaintiff's failure to give separate or additional notice of the loss, for by its own neglect or failure to send her the certificate of insurance, to which she was entitled, she did not know the name of her insurer or where notice was to be sent. She did all she could and the defendant received prompt notice through the Brockway Motor Co. as a result of her son's action on her behalf. The defendant's agent—not a *broker*, as stated by defendant's attorney, but the *company's agent*, who issued and countersigned the policy and thereby made it a valid contract of insurance, and to whom, under its express terms, notice of loss was to be given—on January 13, 1934 directed Keystone Adjustment Bureau of Pittsburgh to "make an immediate

investigation and adjustment of this loss." That the agent had authority to employ this firm of insurance adjusters on defendant's behalf may be inferred not only from the circumstances present in the case but also from the fact that the defendant, in defending this action, made use of the report of the adjusters so employed. See *Umbras v. Prudential Ins. Co.*, 130 Pa. Superior Ct. 437, 440, 198 A. 470. Within a few days, one Greenwood, a representative of Keystone Adjustment Bureau, called at the plaintiff's home or place of business, for the purpose of adjusting the loss, inspected the remains of the truck, interviewed Dominic Sgro and others, requested Dominic to come to Pittsburgh, which he did, obtained from him and J. R. Dickey signed statements of the particulars of the fire and loss, and informed him (Dominic) that settlement would be made and that he would let them know if they had to do anything else. Nothing further was required of Mrs. Sgro or her son, and they did everything they were requested to do: *Cara v. Newark Fire Ins. Co.*, 312 Pa. 489, 491, 167 A. 356; *Zaffuto v. Northern Ins. Co.*, 109 Pa. Superior Ct. 376, 167 A. 298; *Jenkins v. Franklin Fire Ins. Co.*, 282 Pa. 380, 384, 127 A. 836. In reliance on the adjuster's statement they waited for the promised settlement. It must be remembered that during all this time the plaintiff had no policy, no certificate of insurance, and no information as to the name of the insurance company or the requirements of the policy.

We shall not attempt to give the details that followed. Having waited for some time without hearing further from the adjuster, Mrs. Sgro employed attorneys to look after her interests and collect the insurance due her. The attorneys tried to learn the name of the insurance company and secure the policy insuring the truck. With this end in view they communicated with the Brockway Motor Company and the Key-

stone Adjustment Bureau, respectively. They asked the former for a copy of the policy and offered to pay the balance due on the truck, but were put off from month to month, and were finally notified by the Brockway Company that the insurance company had paid it for its loss and that the policy would not be sent the plaintiff. The Keystone Adjustment Bureau was asked the name of the insurance company by whom it had been employed, but refused to give it without permission, and just before Christmas, 1934, definitely refused to give the information. Finally on January 7, 1935 the plaintiff's attorneys wrote Mr. M. J. Kelly, Treasurer of Brockway Motor Co., at Cortland, N. Y., that unless the company furnished them the name of the insurance company which issued the fire and theft policy and a copy of the policy, they would secure an order of court compelling it to produce this information; and on January 11, 1935 they received a letter from York-Jersey Underwriters Agency, Inc., by H. Van Iderstine, Jr., dated January 10, 1935, *one year to the day after the fire,* in answer to their letter to Mr. Kelly of January 7th, which gave them the following information: That the Policy had been issued by Stuyvesant Insurance Company to Brockway Motor Company; that "on February 23, 1933 we received from the Pittsburgh Branch of the Brockway Motor Company an application to insure a truck sold to Lucy Sgro to cover fire and theft insurance and $100 deductible collision. This insurance was to cover a 1933 Brockway Model 80—1½ ton dump truck, serial #80-C5-5700, Motor #26-B-2251"; that memorandum #1025 in favor of Lucy Sgro had been issued; that the insurance carrier (Stuyvesant Insurance Co.) had been reinsured by Pearl Assurance Company. Copies were not forwarded because "We do not have in our possession any blank copies of these memorandums," but four days later on the insistence of plaintiff's attorneys

and, "to avoid the Brockway Motor Company being subjected to any inconvenience," they enclosed a photostatic copy of the *Agent's Copy* of Stuyvesant certificate #1025 issued to Lucy Sgro, Numine, Pa. The letter of January 10, 1935 went on to say, "On January 12, 1934 we received a report from the Brockway Motor Company at Pittsburgh, advising us that on January 10th, the truck insured under certificate #1025 took fire on the highway ...... Under date of January 13th we assigned this loss to the Keystone Adjustment Bureau at Pittsburgh, telling them to make an immediate investigation and adjustment of this loss. Under date of January 15th we received an acknowledgment from the Keystone Adjustment Bureau of the assignment." This amounted to a declaration of the employment of Keystone Adjustment Bureau on behalf of defendant.

This letter, which was offered by the plaintiff as Exhibit 5, and the letter of January 14, 1935 enclosing the photostatic copy of the certificate, Exhibit 6, should have been received in evidence. They were signed on behalf of York-Jersey Underwriters Agency, Inc. by H. Van Iderstine, Jr. George M. Bauer, the cashier and accountant of the Pittsburgh Branch of Brockway Motor Co. testified that all the letters relating to certificates issued under the policy of insurance were signed the same way and in his opinion by the same person. The letter was excluded because Mr. Bauer had never *seen* H. Van Iderstine, Jr. *write his name.* But a comparison of the signature to the letters with the signature countersigning the original policy would satisfy any reasonable person that they were written by the same man. The circumstances all point to the genuineness of the signature and are such as to put the defendant to disproving its authenticity if it denies it. Mr. Bauer had not seen the Secretary of his Company, F. C. Odell, write his name (p. 155a) but the

court admitted in evidence an exhibit offered by the defendant wholly out of turn, on no better authority. When men have corresponded with officials or representatives of business houses and have received letters purporting to be signed by such officials or representatives over a considerable period of time relating to transactions in the usual course of business, they are competent to identify such signatures received in the regular course of business even though they never saw the person actually sign his name. Tellers at banks do it every day. The course of modern business renders it necessary.

With Exhibit 5 in evidence—in connection with the other evidence properly in the case—we think the plaintiff made out a case for the jury.

In their letter of January 10, 1935, the defendant's agents stated that "the insurance carrier handling the Brockway Company's business had been *reinsured* by the Pearl Assurance Company." If this statement was false or incorrect, it is for the defendant to disprove it, if it deems it material. As we view the case, however, it is immaterial to this plaintiff whether the defendant company reinsured its risk or cancelled the policy, unless it can show that it gave the plaintiff five days' written notice of such cancellation prior to January 10, 1934. Otherwise, the insurance certificate issued in favor of the plaintiff, as the assured, remained in force and effect and protected her against loss by fire *and* theft.

In their letter of January 10, 1935, defendant's agents also stated, "Investigation by the Keystone Adjustment Bureau disclosed that the *assured* [that is, this plaintiff] used the truck for state road work most of the time, but during the winter months it was used for general hauling and at the time of the loss was used for hauling straw for farmers. They further advised that when Sgro reported the loss to the Brockway

Company, they advised him to have someone remain with the truck or bring it to a place where it would be protected. Later developments disclosed the fact that the truck was left unattended for some period of time and in the meantime, various parts were stolen. We believe that as an attorney you are perhaps more familiar with the terms and conditions of an insurance policy than we are and that first there was a violation of warranty in the policy in which the assured's occupation was described as contracting instead of trucking; secondly—that they abandoned the truck after the loss with no attempt to protect the salvage."

These were adopted as two of defendant's grounds of defense to this action. Neither, in the light of the evidence in the case, justified the entry of a compulsory non-suit or a directed verdict for the defendant.

(1) It must be remembered that Brockway Motor Co., defendant's agent in the insurance 'binder,' furnished defendant with the information as to the plaintiff's occupation, and that plaintiff never saw the certificate and had no means of checking up on its accuracy. But apart from this, we are of opinion that the warranty that the assured's occupation was 'general contracting' was not broken by her using her trucks for general hauling and trucking for other persons when not engaged on a contracting job; especially, as the warranty in the certificate as to the *uses* to which the automobile would be put was, 'commercial.' They are not inconsistent or incompatible. It would be just as unfair to invalidate a policy issued to a real estate agent because he did not declare his occupation to be 'real estate *and insurance*'; or to a lawyer, because he did not state his occupation as, 'law *and collections*.' The named assured in this case warranted their occupation to be 'truck manufacturers.' Would the policy be avoided by their manufacture of other automobiles or trailers, as a side line? Section 2 of the policy rider

calls on the assured to declare for insurance under the policy *every vehicle financed by them* on the installment plan, excepting only (in section 4) vehicles used for carrying passengers for hire or rental or leased.

(2) The evidence on behalf of the plaintiff, if believed, disproved an abandonment of the damaged truck. The parts stolen were taken between 11:30 P. M. of January 10, when Dominic went to his home and the tires were still burning, and 8:00 A. M. the next morning when he came back. Nothing was taken after the remains were hauled to plaintiff's garage. The Brockway representative examined them a day or two later and testified they were only junk.

(3) As to the remaining defense chiefly relied on by the defendant, to wit, that the action was not brought within twelve months after the fire, the plaintiff's evidence, if believed, brings the case within the ruling of our Supreme Court in *Arlotte v. National Liberty Ins. Co.*, 312 Pa. 442, 167 A. 295. See also *Nanty-Glo Borough v. American Surety Co.*, 316 Pa. 408, 175 A. 536; *Rapochi v. Continental Ins. Co.*, 121 Pa. Superior Ct. 538, 184 A. 308. The defendant was, in the first place, responsible for the failure of the plaintiff to receive the certificate of insurance to which she was entitled; and the testimony of plaintiff's attorneys, William A. Ashe and John E. Evans, Jr., and their communications and correspondence with Brockway Motor Co. and Keystone Adjustment Bureau, which were relevant and should have been admitted, warrant the inference, to be drawn by a jury, that the defendant or its agent, concerted with the Brockway Motor Co. and the Keystone Adjustment Bureau in denying plaintiff information to which she was entitled until the twelve months' period had expired.

This action was brought on February 20, 1935, within a reasonable time after the information necessary for its institution had been obtained: *O'Connor v. Alle-*

*mannia Fire Ins. Co.,* 128 Pa. Superior Ct. 336, 347, 194 A. 217.

It must not be forgotten that there is no allegation on the part of the defendant that the fire which destroyed plaintiff's truck was the result of any wilful misconduct on her part or the part of her agents.

The assignments of error are sustained to the extent indicated in this opinion. The judgment of the lower court is reversed. Judgment of non-suit is stricken off and a new trial awarded.